## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTOPHER MCNAUGHTON, a Pennsylvania citizen | **)** CIVIL ACTION |
| | **)** |
| Plaintiff, | **)** Case No.: 2:21-cv-03802-MMB |
| | **)** |
| | **)** |
| v. | **)** |
| | **)** **JURY TRIAL DEMANDED** |
| UNITEDHEALTHCARE INSURANCE COMPANY, a Connecticut corporation, and UNITED HEALTHCARE, INC., a Delaware corporation, | **)** |
| | **)** |
| | **)** |
| | **)** |
| Defendants. | **)** |
| | **)** |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

AND NOW comes the Plaintiff, Christopher McNaughton, by and through his counsel, Gesk Moritz, LLC and Jonathan M. Gesk, Esquire, and hereby files this Second Amended Complaint, and in support thereof avers as follows:

### I.    THE PARTIES

1.    Plaintiff Christopher McNaughton is a competent adult individual and a citizen of Pennsylvania with an address at 229 Woodland Drive, State College, Pennsylvania 16803.

2.    Defendant UnitedHealthcare Insurance Company, upon information and belief is, and at all relevant times was, a corporation duly organized and existing

1

under and by virtue of the laws of the State of Connecticut with its principal place of business at 9900 Bren Road, East Minnetonka, Minnesota 55343.

3.     Defendant United Healthcare, Inc. is, and at all relevant times was, a corporation duly organized and existing under and by virtue of the laws of the State of Delaware with its principal place of business at 9900 Bren Road, East Minnetonka, Minnesota 55343.

4.     UnitedHealthcare Insurance Company and United Healthcare, Inc. are collectively referred to hereafter as "United".

5.     United are insurance companies licensed and authorized to do business within the Commonwealth of Pennsylvania, and did in fact conduct business, including selling policies, adjusting claims and accepting premiums, and conducting insurance activities in the Commonwealth.

6.     It is believed and averred that United supervised, directed, and controlled the activities with respect to the handling of Plaintiff's health insurance claim and formulated guidelines and policies for handling, adjusting, negotiating, and paying claims.

7.     At all times material hereto, United acted, by and through its agents, ostensible agents, servants, and employees, acting in the course and scope of their agency and/or employment for whose conduct United is liable vicariously or otherwise.

II.   **JURISDICTION AND VENUE**

8.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the citizenship of the parties is diverse.

9.      The amount in controversy exceeds $75,000.00 exclusive of interest and costs.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claim occurred in this district.

III.   **FACTUAL BACKGROUND**

11.     Plaintiff Christopher McNaughton was diagnosed with severe ulcerative colitis in January 2014 at the age of twenty-two.

12.     Ulcerative colitis is a chronic disease that causes inflammation and ulcers in the digestive tract. There is no known cure and ongoing treatment is required to prevent serious health consequences.

13.     This disease caused Mr. McNaughton to have bloody diarrhea more than twenty times a day; severe abdominal pain; severe anemia causing constant fatigue; loss of appetite; significant weight loss and malnutrition; severe inflammatory arthritis which leaves him unable to walk and requires hospitalization; severe, recurrent, life-threatening, deep vein thrombosis resulting in repeated

hospitalizations; repeated fractures and osteopenia; and severe secondary adrenal insufficiency.

14.     This disease is horrible, and as a result, Mr. McNaughton sought out the best care possible.

15.     In May 2015, after he treated with several doctors who were unable to effectively treat his ulcerative colitis, Mr. McNaughton was referred to and began treating with Dr. Edward Loftus at the Mayo Clinic in Rochester, Minnesota. Dr. Loftus is one of the top gastroenterologists in the country.

16.     Over a span of nearly five years after his initial diagnosis, Mr. McNaughton, with the assistance and guidance of his physicians, had tried and failed numerous treatment regiments in an attempt to treat his condition.

17.     However, in October 2018, after failing all other treatment options and regiments, Dr. Loftus prescribed Mr. McNaughton two biologics to be taken more frequently and at higher doses as the less frequent and lower doses were ineffective. Dr. Loftus prescribed Remicade 20 mg/kg every 4 weeks and Entyvio 600 mg every 4 weeks (the "treatment").

18.     The treatment, which Mr. McNaughton received via intravenous infusions, was critical to his health and wellbeing.

19.     As a result of this treatment in the dosages prescribed by Dr. Loftus, Mr. McNaughton was finally able to gain relief from his illness and achieved clinical remission.

20.     This treatment was and is medically necessary to control Mr. McNaughton's disease and reduce the chances of flare ups, bleeding, cancer, and other complications, including potential death.

21.     This treatment allowed Mr. McNaughton to attend college in person after more than 7 years of battling his disease and being unable to leave his home for any significant length of time. This treatment allowed Mr. McNaughton to achieve his dream of a normal life without debilitating pain and suffering and to try and regain some normalcy and daily function.

22.     The treatment still required multiple hours of infusions, every 2 weeks, in a hospital setting. But the inconvenience pales in comparison to the life Mr. McNaughton lived from January 2014 to October 2018.

23.     In the summer of 2020, Mr. McNaughton enrolled at Pennsylvania State University-University Park campus.

24.     At that time, Penn State offered a student health insurance plan through United.

25.     Mr. McNaughton purchased the student health plan.

IV.   **THE POLICY**

26.   United issued a school-sponsored health insurance plan, referred to as Blanket Student Accident and Sickness Insurance Plan to the Pennsylvania State University, Policy No. COL-17-PA (PY21) CERT. *See* Certificate of Coverage attached hereto as Exhibit A.

27.   The master policy is currently in the possession of United and is unavailable to Plaintiff.

28.   Under this plan, United agreed to pay "for Covered Medical Expenses . . . less any deductible incurred by or for an insured Person for loss due to injury or sickness subject to: a) the maximum amount for specific services as set forth in the Schedule of Benefits; and b) any Coinsurance or Copayment amounts set forth in the schedule of Benefits or any benefit provision hereto." *See* Exhibit A.

29.   Under the plan, Covered Medical Expenses include infusion therapy and prescription drugs. *Id*.

30.   The plan defines "Covered Medical Expenses" as "reasonable charges which are: 1) not in excess of Usual and Customary Charges; 2) not in excess of the Preferred Allowance when the policy includes Preferred Provider benefits and the charges are received from a Preferred Provider; 3) not in excess of the maximum benefit amount payable per service as specified in the schedule of benefits; 4) made for services and supplies not excluded under the policy; 5) made for services and

6

supplies which are a medical necessity; 6) made for services included in the Schedule of Benefits and 7) in excess of the amount stated as a deductible, if any." *See* Exhibit A, at p. 21, sec. 11.

31. Medical necessity and medically necessary are defined in the policy as follows: "those services or supplies provided or prescribed by a Hospital or Physician which are all of the following: 1) Essential for the symptoms and diagnosis or treatment of the Sickness or Injury; 2) Provided for the diagnosis, or the direct care and treatment of the Sickness or Injury; 3) In accordance with the standards of good medical practice; 4) Not primarily for the convenience of the Insured, or the Insured's Physician; 5) The most appropriate supply or level of service which can safely be provided to the Insured." *See* Exhibit A, at p. 23, sec. 11.

32. At all times pertinent hereto, Mr. McNaughton was an insured person under the policy.

33. Mr. McNaughton, as a student at Pennsylvania State University, was eligible to and did in fact enroll in the school-sponsored health insurance plan issued by United.

34. Mr. McNaughton first enrolled in the school-sponsored health insurance plan on July 1, 2020, which was near the end of the 2019-2020 plan year, and then he re-enrolled for the 2020-2021 plan year.

35.     Mr. McNaughton subsequently re-enrolled in the school-sponsored health insurance plan for the 2021-2022 and the 2022-2023 school years.

36.     Mr. McNaughton paid monthly premiums in exchange for United's promise to cover medically necessary treatments which included the treatment prescribed by Dr. Loftus.

37.     Notwithstanding United's legal and contractual obligations, United repeatedly and unreasonably denied Mr. McNaughton insurance benefits, such as his medically necessary infusion medications in the dosages prescribed by Dr. Loftus.

## V.   UNITED'S HANDLING OF PLAINTIFF'S COVERED MEDICAL EXPENSES

38.     The treatment prescribed by Dr. Loftus was covered by Mr. McNaughton's former health plan, Aetna, before Mr. McNaughton joined United's health plan.

39.     Before Mr. McNaughton enrolled in the United plan, United represented to him that his treatment would not require a prior authorization. All that would be required for coverage under the policy, according to United's representations, was a referral from the Pennsylvania State University Health Services.

40.     Before enrolling, Mr. McNaughton confirmed through a benefits specialist and Dr. Meyer, a doctor at Pennsylvania State University Health Services, that the United student plan would cover Mr. McNaughton's treatment.

8

41.     In light of these representations, and given that Mr. McNaughton had the necessary referral, he enrolled in the United Plan under the belief that his treatment would be covered.

42.     Initially, United covered the medically necessary treatment Mr. McNaughton received in July 2020 and August 2020, under the 2019-2020 and 2020-2021 plan years, respectively.

43.     However, in October 2020, United suddenly, unreasonably, and without notice, stopped paying for the infusions.

44.     United did not immediately inform Mr. McNaughton that it was denying his treatment and that it would no longer pay for the treatment, therefore he initially was unaware that the bills were not being paid.

45.     Mr. McNaughton eventually learned that the bills were not being paid. At that point, he had incurred over $1 million in unpaid treatment bills.

46.     Over the next 4-5 months, Mr. McNaughton repeatedly attempted to determine why United had stopped paying for his medically necessary treatments.

47.     Mr. McNaughton continued to receive the treatment despite United's refusal to pay as it was necessary and life-saving treatment.

48.     Finally, on February 1, 2021, a United customer service representative informed Mr. McNaughton's mother that United had stopped paying for the

treatment because it had flagged Mr. McNaughton's account as a "high dollar amount".

49.    Mr. McNaughton ultimately came to learn that United had an internal written policy of flagging insureds that received certain expensive or "high dollar" treatments.

50.    Pursuant to that internal policy, United would then secure the insured's medical records and attempt to find a way to reduce the costs of covering that insured and his or her treatments, whether by denying the treatment, reducing the treatment, or changing the treatment.

51.    This internal policy is not mentioned or incorporated into the student health plan and is intentionally hidden from Pennsylvania State University and its students.

52.    This internal policy is a deliberate attempt to put United's profits over the health of its insureds.

53.    More troubling, this internal policy was not even adopted until after the plan year had begun and after Mr. McNaughton had received multiple infusions which were properly paid for by United.

54.    In sum, United unilaterally and without notice to Mr. McNaughton, stopped paying for Covered Medical Expenses due to their high costs and not

because the treatment was not covered under the policy. These actions clearly show that United was placing its own interest over its insured.

55.    On March 5, 2021, Mr. McNaughton received an email from the Penn State administration indicating that they had spoken with United, and United had agreed to pay for Mr. McNaughton's past infusion bills as well as cover them through August 12, 2021, the end of the 2020-2021 policy term.

56.    The benefits that had been denied were then retroactively paid for by United.

57.    United characterized this decision to honor the policy as an "exception" it was making only that year. United never articulated why it was considered an "exception" given that the benefits were clearly owed to Mr. McNaughton under the policy.

58.    United also characterized this decision to honor the policy as a "business decision", i.e., it sought to maintain the profitable Pennsylvania State University account while at the same time not conceding or giving up on its deceptive and bad faith internal policy of treating high-cost insureds differently.

59.    It is significant to note that at the time United informed Pennsylvania State University that it would cover Mr. McNaughton's treatments for the remainder of the plan year, it had not yet come up with any legitimate basis for denying coverage.

60.   For a period of approximately five months, United denied medically necessary treatments without even communicating a reason for the denial and without having even internally documented a basis for the denial. United simply stopped paying the claims because they were too expensive.

61.   United would later go on to tell Pennsylvania State University and Mr. McNaughton that it does this to try and keep costs lower for all insureds. In other words, United is justified in discriminating against a few insureds because it allegedly works in favor of the great majority of the insureds.

62.   On March 29, 2021, Mr. McNaughton learned that prior to the 2021-2022 school year, United would require him to undergo a predetermination of benefits process, and that this predetermination process was a "special exception" it created specifically for Mr. McNaughton.

63.   The special exception was not part of the plan and was only created by United so that it could avoid paying for the Covered Medical Expenses during the upcoming 2021-2022 school year plan by either scaring Mr. McNaughton into not enrolling in the plan if it could convince him that his treatment would not be covered or, in the alternative, deter him from receiving the treatments if he was led to believe he would have to pay for them out-of-pocket (the yearly cost of the infusions is more than $2,000,000.00).

64.    United's conduct was nothing more than a pretextual ruse designed to find a way to avoid payment of Covered Medical Expenses that were due and owed under the plan and to justify United's predetermined position that it would not pay for the treatment due to its high cost.

65.    United had paid for the treatments initially, then denied them, then agreed to pay for them, then sought to deny them again.

66.    This harassing and bad faith conduct targeted a sick insured-student simply because he had a disease and it required expensive treatments.

67.    On May 4, 2021, as part of this fabricated pre-determination process, United had a medical necessity review performed by Dr. Vikas Pabby through the Medical Review Institute of America ("MRIOA").

68.    MRIOA is a subcontractor to United and provides various medical professionals to United in order to have coverage decisions reviewed.

69.    Specifically, Dr. Pabby was asked whether dual-biologic therapy (Entyvio and Remicade together) was medically necessary.

70.    Dr. Pabby opined that dual-biologic therapy was not medically necessary as it violated United's Commercial Drug Criteria.

71.    Dr. Pabby failed to actually opine on whether the treatment was medically necessary as defined by the applicable insurance policy.

72.     Instead, Dr. Pabby only opined that the treatment was not medically necessary because United's Commercial Drug Criteria states that the two drugs cannot be taken together.

73.     The Commercial Drug Criteria are not part of the insurance policy, not referenced in the insurance policy, not adopted by the insurance policy, and not provided to the insureds when they enroll in the student health plan.

74.     Instead, they are internal criteria United uses in bad faith to find that a treatment is not medically necessary, despite the fact that the definition of medically necessary does not make reference to or otherwise incorporate the criteria.

75.     Upon receiving Dr. Pabby's opinion, United immediately realized that the opinion had no basis in medicine as dual-biologic therapy was absolutely necessary to control Mr. McNaughton's ulcerative colitis and because it was widely-accepted in the field of gastroenterology that dual-biologic therapy is the best way to treat severe ulcerative colitis.

76.     In continuing its bad faith, United did not advise Mr. McNaughton of Dr. Pabby's medical necessity review and likewise did not advise him of his rights to challenge or appeal the review.

77.     Inexplicably, United's insurance broker, FirstRisk Advisors, chose to request a peer-to-peer review, purportedly on behalf of Mr. McNaughton.

78.     This was a clear breach of the insurance contract.

79.    Mr. McNaughton did not learn that a peer-to-peer review had been requested until either right before or right after it occurred.

80.    The peer-to-peer review was conducted on May 12, 2021, between Dr. Pabby and Dr. Loftus.

81.    On that short phone call, Dr. Loftus advised Dr. Pabby that Mr. McNaughton had failed all alternative treatments, all lower doses and frequencies of Entyvio and Remicade, and that changing the treatment regiment could be life-threatening.

82.    Notwithstanding Dr. Loftus' grave warnings and expert insights on Mr. McNaughton's disease history, Dr. Pabby opined that dual-biologic therapy was in fact medically necessary, but not in the doses and frequency prescribed by Dr. Loftus.

83.    On May 14, 2021, Mr. McNaughton received an email stating that United would not cover the infusions and that it was denying him a benefit he was entitled to under the insurance policy.  *See* Email attached hereto as Exhibit B.

84.    The email said that the reason for the denial was that in the peer-to-peer review Dr. Loftus agreed that the current treatment was "not appropriate" and that it was "appropriate" for him to receive a treatment protocol suggested by United that would cost significantly less. *Id.* The letter also stated that Dr. Loftus had agreed to reduce the doses of the medications. *Id.*

15

85.     United's representation of the statements allegedly made by Dr. Loftus proved to be false and an attempt in bad faith to avoid paying for the covered treatment prescribed by Dr. Loftus.

86.     First, United had a copy of Dr. Pabby's report and knew that the report did not state that Dr. Loftus had agreed to the change in treatment. Second, United was provided an email from Dr. Pabby wherein Dr. Pabby confirmed that Dr. Loftus had not agreed that the treatment should be changed.

87.     But United continued to blatantly and intentionally mislead Mr. McNaughton and Pennsylvania State University.

88.     As this process was unfolding, United began exchanging internal communications wherein they calculated how much money they would save if Mr. McNaughton was forced to take lower doses on a less frequent basis.

89.     Another United employee cheered the result of the peer-to-peer review wherein Dr. Pabby opined that the treatment should be denied.

90.     On May 19, 2021, Dr. Loftus wrote a letter stating that Mr. McNaughton required the treatment that he prescribed, and that the failure to provide the treatment could have "serious detrimental effects on both his short term and long term health and could potentially involve life threatening complications. This would ultimately incur far greater medical costs. Chris was on the doses suggested by

United Healthcare before, and they were not at all effective." *See* May 19, 2021 letter attached hereto as Exhibit C.

91.     United continued to operate in bad faith and with total disregard for Mr. McNaughton's well-being, its contractual requirements, and the rule of law.

92.     Perhaps in response to receiving Dr. Loftus' May 19th letter, on May 24, 2021, United had another medical necessity review performed by an MRIOA gastroenterologist, Dr. Nitin Kumar.

93.     Dr. Nitin Kumar opined that Mr. McNaughton's treatment was medically necessary and that he faced life-threatening consequences if the treatment was denied or altered, including "uncontrolled disease (including dysplasia leading to colorectal cancer), flare, hospitalization, need for surgery, and toxic megacolon." *See* attached hereto Exhibit D.

94.     According to United's policies, this review should have been final and Mr. McNaughton should have been entitled to coverage.

95.     Dr. Kumar was considered a "medical director" and his opinion finding that the treatment was medically necessary was binding on United.

96.     Upon receiving this report, United was upset with the result of the medical necessity review.

97.     United called MRIOA and complained about the result and asked that it be reassigned to Dr. Pabby.

98.    United could not use a medical necessity review to deny coverage that found Mr. McNaughton's treatment was medically necessary and thus had to have it redone so that its bad faith denial of benefits would not be completely undermined.

99.    United had it reassigned to Dr. Pabby and then United destroyed the Dr. Kumar report. United never informed Mr. McNaughton or Pennsylvania State University about the report and United did not produce the report during discovery in this lawsuit.

100.    The United employee responsible for coordinating these reviews, Victoria Kavanaugh, testified that she has discarded reports in the past for other patients.

101.    At this point, United had been informed by two gastroenterologists, including the world-renown and treating gastroenterologist, that Mr. McNaughton could die if he did not receive the treatment.

102.    United still did not budge.

103.    On June 4, 2021, after having been confronted with the fraudulent statements in its May 14, 2021 denial, United issued a new denial letter to Mr. McNaughton advising him that it would not cover his treatments. *See* June 4, 2021 denial letter attached hereto as Exhibit E.

104.    United unequivocally stated: "This is a denial for benefits under the plan for the prescribed treatment."

18

105.    United also stated that Mr. McNaughton had "exhausted the internal appeal process." *Id.*

106.    At no point prior to issuing the internal review process determination did United provide Mr. McNaughton with the name or other contact information of the employee or department designated to coordinate the Internal Review in direct violation of the terms of the contract. *See* Exhibit A, at p. 28.

107.    Likewise, United failed to provide Mr. McNaughton notice that he was entitled to submit written comments, documents, records, and other material relating to the request for benefits to be considered when conducting the Internal Review in direct violation of the terms of the contract. *See* Exhibit A, at p. 28.

108.    Additionally, prior to issuing its final determination, United failed to provide Mr. McNaughton any new or additional evidence considered by United in connection with the grievance and any new or additional rationale upon which the decision was based in direct violation of the terms of the contract. *See* Exhibit A, at p. 28.

109.    United also failed to provide Mr. McNaughton with an opportunity to respond to any new or additional evidence or rationale in direct violation of the terms of the contract. *See* Exhibit A, at p. 28.

110.    This special process informally developed by United as a ruse to deny Mr. McNaughton benefits also bypassed the standard internal review process, which

Mr. McNaughton was entitled to and from which he could have appealed to an external agency.

111.   In that June 4th letter, United denied Mr. McNaughton's medical treatment and claimed that "the prescribed dosages for the two drugs are not established when using a dual biologic therapy[]" and that the reviewers were concerned with the safety of the prescribed dosage and frequency. *Id.*

112.   United's claims were baseless, fraudulent, and outrageous. The claims were directly inconsistent with all the information provided by Dr. Loftus regarding the reason for the prescribed treatment and the excellent medical response by Mr. McNaughton to that treatment.

113.   United stated that the treatment was reviewed three times and that the "medical reviewers have concluded that the medication as prescribed does not meet the Medical Necessity requirement of the plan."

114.   The phrase "reviewed three times" was intentionally deceptive and misleading. It omitted the fact that Dr. Kumar had reviewed the treatment and had found that it was medically necessary.

115.   The term "reviewers" was intentionally deceptive and misleading as one reviewer was Dr. Nady Cates, a family care physician who had no knowledge of gastroenterology, did not know how to treat and had never treated ulcerative colitis, and who had not seen a patient in more than 30 years.

116.   Dr. Cates is a doctor employed by United with the sole function of performing medical necessity reviews.

117.   Dr. Cates performs hundreds of reviews per week from his desk, including reviews of treatments for which he has no knowledge or experience.

118.   Dr. Cates testified that he did not know the risks associated with stopping or changing Mr. McNaughton's treatment.

119.   Dr. Cates could not recall whether he was even provided Mr. McNaughton's medical records in order to opine on the medical necessity of the treatment.

120.   Dr. Cates testified that a lay person could perform the medical necessity reviews because he is not actually evaluating the medical necessity of the treatment, but rather is only checking to see if the treatment meets United's Commercial Drug Criteria.

121.   Dr. Cates testified that he did not know whether Mr. McNaughton had already failed the treatment United recommended.

122.   Dr. Cates testified that the fact that the treatment had drastically improved Mr. McNaughton's condition was not considered in his opinion that the treatment was not medically necessary.

123.   Dr. Cates further testified that the recommendation of the treating physician, Dr. Loftus, had no impact on his medical necessity review and that the

21

risks Mr. McNaughton faced if he did not receive the medication in the necessary doses to control his disease had no impact on his decision to deny the treatment.

124.   Lastly, Dr. Cates never even opined that the treatment regiment was unsafe, only that the doses exceeded the Commercial Drug Criteria guidelines.

125.   Most importantly, the "reviewers" did not uniformly agree that the treatment was not medically necessary. Dr. Kumar found that it was medically necessary, but United destroyed and buried that report.

126.   United was not at all concerned about the safety of its insured as United claimed. Rather United was only concerned about its own financial interests thereby putting Mr. McNaughton's health in extreme jeopardy.

127.   The June 4, 2021, letter also advised Mr. McNaughton that United would not cover his treatments at the dosage prescribed by Dr. Loftus because it did not meet United's requirements for medical necessity.

128.   These statements were directly inconsistent with what Dr. Loftus informed United about Mr. McNaughton's prescribed treatment.

129.   On June 7, 2021, Dr. Loftus wrote another letter explaining that he never said the things attributed to him in Dave Opperman's fraudulent email on May 14, 2021. *See* June 7, 2021, letter attached hereto as Exhibit F.

130.   United ignored and did not respond to Dr. Loftus' correspondence.

131.   Any fair and objective analysis of Mr. McNaughton's treatment would clearly indicate that the treatment prescribed by Dr. Loftus was a Covered Medical Expense and payable under the policy. United did not have a reasonable basis for claiming that Mr. McNaughton's treatment was not covered under the plan and United knew or recklessly disregarded its lack of a reasonable basis.

132.   United had a fiduciary obligation to cover Plaintiff's Covered Medical Expenses and owed Mr. McNaughton the duty of good faith and fair dealing.

133.   United had a duty to conduct a prompt, thorough, objective, and timely investigation of whether Mr. McNaughton's treatment was a Covered Medical Expense under the plan.

134.   United had a duty to act in good faith in investigating Mr. McNaughton's treatment and the medical necessity of the treatment. This includes not lying about the process, not treating Mr. McNaughton differently solely because his treatment is expensive and he has chronic illness, following the guidelines set forth in the insurance policy, not destroying evidence of the medical necessity of the treatment, etc.

135.   United also owed a duty to find information that supports coverage rather than looking for ways to deny coverage as it did in this case.

136.   Despite information to the contrary, United proceeded to deny coverage to Mr. McNaughton for Covered Medical Expenses which required Mr.

McNaughton to incur substantial legal fees and expenses to obtain payment for his treatment.

137.   Mr. McNaughton was subjected to extreme stress as his life hung in the balance. He suffered emotional and mental trauma, post-traumatic stress disorder, anxiety, depression, and physical injuries, including the development of two autoimmune diseases.

138.   In violation of the plan and the laws of the Commonwealth of Pennsylvania, United, without legal justification, required Mr. McNaughton to file a lawsuit and seek injunctive relief.

139.   On August 25, 2021, Mr. McNaughton filed this lawsuit seeking damages and an injunction barring United from denying coverage for the treatment.

140.   United ultimately offered to pay for the treatments only if Mr. McNaughton dropped his lawsuit.

141.   This was another act of bad faith as United knew it had a contractual obligation to pay for the treatment.

142.   United again in the midst of this lawsuit, sought to deny Mr. McNaughton's medical treatment.

143.   In October 2022, Mr. McNaughton's previous treatments were not paid for and he was advised that a medical necessity review was being performed.

144.   Mr. McNaughton experienced substantial stress as United renewed its threats, and he was forced to administer emergency Solumedrol shots to avoid an adrenal crisis.

145.   United's conduct since October 2020 has been unlawful, egregious, and in bad faith.  The conduct includes the aforementioned actions and inactions, and specifically the following:

      a.    Misrepresenting coverage for covered medical expenses under the plan;

      b.    Withholding information and/or documents pertaining to coverage under the plan;

      c.    Asserting frivolous reasons for denying coverage under the plan;

      d.    Misleading Plaintiff as to what is a Covered Medical Expense under the plan;

      e.    Misleading Plaintiff as to the policy information;

      f.    Denying payment of Covered Medical Expenses;

      g.    Forcing Plaintiff to file a Complaint to obtain payment for Covered Medical Expenses;

      h.    Engaging in actions designed to delay or deny the ultimate payment of Covered Medical Expenses;

      i.    Misinterpreting its own policy;

j.     Knowing and/or recklessly disregarding the lack of a reasonable basis in denying the payment of Covered Medical Expenses;

k.     Unreasonably making treatment decisions based on financial concerns;

l.     Using utilization guidelines that are unreasonably stringent and stop members from receiving medically necessary care;

m.    Failing to provide notice to Plaintiff that it was not paying Covered Medical Expenses during the 2020-2021 plan;

n.     Failing to give equal consideration to providing coverage to Plaintiff under the plan;

o.     Misrepresenting statements made by Plaintiff's treating physician, Dr. Loftus;

p.     Assuming a fiduciary obligation and failing to carry out the same in good faith;

q.     Ignoring medical information from Dr. Loftus who is recognized as one of the top gastroenterologists in the country;

r.     Forcing Plaintiff to retain counsel and the expenses associated therewith to secure coverage for Covered Medical Expenses under the plan;

s.      Failing to fully disclose and/or misrepresenting the coverage available to Plaintiff under the plan;

t.      Misrepresenting the benefits, conditions and terms of the applicable insurance policy and limits and/or pertinent facts or policy or contract provisions relating to coverage of Covered Medical Expenses at issue in violation of 40 P.S. § 1171.5;

u.      Refusing to pay claims without conducting a reasonable investigation based upon all information available in violation of 40 P.S. § 1171.5;

v.      Compelling Plaintiff to institute litigation and recover amounts due under the insurance policy in violation of 40 P.S. § 1171.5;

w.      Misrepresenting the benefits, conditions and terms of the applicable insurance policy and limits and/or pertinent facts or policy or contract provisions relating to coverages at issue in violation of 40 P.S. § 1171.5;

x.      Failing to affirm or deny coverage of claims within a reasonable time after the claim was submitted by Plaintiff and communicated to the company or its representative in violation of 40 P.S. § 1171.5;

y.      Failing to advise Plaintiff of the acceptance or denial of a claim
        pursuant to 31 Pa. Code 146.7;

z.      Failing to advise Plaintiff of the investigation of coverage and/or
        possibility of a coverage issue at a time when the issue was being
        "investigated" by United in violation of 31 Pa. Code 146.7;

aa.     Unnecessarily requiring the insured to incur the time and expense
        associated with pursuing his claim for payment of Covered
        Medical Expenses when United knew or should have known it
        had no good faith basis to deny coverage or payment of
        Plaintiff's treatment;

bb.     Causing likelihood of confusion or of misunderstanding as to the
        source, sponsorship, approval or certification of goods or
        services in violation of 73 P.S. 201-2 et seq.;

cc.     Representing that goods or services have sponsorship, approval,
        characteristics, benefits or quantities that they do not have or that
        a person has sponsorship, approval, status, affiliation or
        connection that he does not have in violation of 73 P.S. 201-2 et
        seq.;

dd.     Advertising goods or services with the intent not to sell them as
        advertised in violation of 73 P.S. 201-2 et seq.;

ee.   Failing to comply with the terms of a written guarantee or warranty given to a buyer, at, prior to or after a contract for the purpose of goods or services in violation of 73 P.S. 201-2 et seq.;

ff.   Breaching its fiduciary duty of good faith and fair dealing;

gg.   Placing its interest over the interest of the insured;

hh.   Failing to honestly, fairly, intelligently and objectively evaluate whether Plaintiff's treatment was a Covered Medical Expense under the plan;

ii.   Engaging in fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding in violation of 73 P.S. 201-2 et seq.;

jj.   Denying coverage for Covered Medical Expenses because of its cost and thereby placing Plaintiff's health in extreme jeopardy.

146.   The conduct of United demonstrates reckless disregard and indifference to the rights of its insured, Mr. McNaughton.

147.   United's denials were done with conscious disregard for the life and safety of Mr. McNaughton.

148.   United's denials of medically necessary treatment to Mr. McNaughton breached the terms of the plan contract and was in bad faith.

149.   United's one-side investigations into the medical necessity of the treatment has been in bad faith, including ignoring and hiding evidence favorable to Mr. McNaughton, fabricating evidence against the medical necessity of the treatment, misrepresenting the terms of the policy, applying and enforcing coverage provisions that are not part of the subject policy, amongst other things.

150.   As a result of the bad faith denials and investigations, Mr. McNaughton has suffered, and continues to suffer, damages, including, but not limited to, economic damages, non-economic damages, and attorneys' fees.

151.   As a result of the conduct described above, Mr. McNaughton has unnecessarily incurred legal fees and costs together with related economic loss, physical injury, physical discomfort, emotional distress, and humiliation, associated with United's failure to honor its health insurance coverage available to Mr. McNaughton and its denials of his treatment and delays in paying for said treatment.

152.   As a proximate result of the aforementioned unreasonable and bad faith conduct of United, Mr. McNaughton has suffered, and will continue to suffer in the future, damages under the plan contract, plus interest, and other economic and consequential damages, for a total amount to be shown at the time of trial.

153.   As a further proximate result of the aforementioned wrongful conduct of United as alleged in this cause of action, Mr. McNaughton has suffered anxiety, worry, and mental and emotional distress.

154.   As a further proximate result of the unreasonable and bad faith conduct of United as alleged in this cause of action, Mr. McNaughton was compelled to retain legal counsel and expend costs in an effort to obtain the benefits due under the plan contract.

155.   United's conduct described herein was intended by United to cause injury to Mr. McNaughton or was despicable conduct carried on by United with a willful and conscious disregard of the rights of Mr. McNaughton, or subjected Mr. McNaughton to cruel and unjust hardship in conscious disregard of Mr. McNaughton's rights, or was an intentional misrepresentation, deceit, or concealment of a material fact known to United with the intention to deprive Mr. McNaughton of property, legal rights or to otherwise cause injury, such as to constitute malice, oppression or fraud entitling Mr. McNaughton to punitive damages in an amount appropriate to punish or set an example of United.

156.   At all relevant times, United's actions were willful, wanton, reckless and intentional and were based upon and motivated by its pursuit of monetary gain without regard for the resulting damage and injury and deprivation of insurance benefits due and owing its insured.

## COUNT ONE

Christopher McNaughton v. UnitedHealthcare Insurance Company and United Healthcare, Inc.

Breach of contract

157.   Plaintiff incorporates by reference each and every of the foregoing paragraphs as though set forth in full in this cause of action.

158.   The conduct of United described in this Second Complaint constitutes a breach of the contract of insurance with Plaintiff in failing to honor Plaintiff's claim for benefits under the policy and denying coverage under the policy in violation of Pennsylvania statutes and applicable case law.

159.   The foregoing conduct of United also constitutes a breach of the Policy's implied covenant of good faith and fair dealing.

160.   Plaintiff has satisfied all of his obligations under the policy, including but not limited to all conditions precedent and all conditions subsequent.

161.   As a consequence of United's breach of contract, United is liable to Plaintiff for actual and consequential damages, including but not limited to pain and suffering.

WHEREFORE, Plaintiff Christopher McNaughton demands judgement in his favor and against Defendants UnitedHealthcare Insurance Company and UnitedHealthcare, Inc. in an amount in excess of $75,000.00 plus attorney's fees, interest and costs, injunctive relief and order requiring Defendants to pay for the medication and such other and further relief as the Court deems just and proper.

## COUNT TWO

Christopher McNaughton v. UnitedHealthcare Insurance Company and United Heathcare, Inc.

### Bad faith 42 Pa.C.S. § 8371

162.   Plaintiff incorporates by reference each and every of the foregoing paragraphs as though set forth in full in this cause of action.

163.   42 Pa.C.S. § 8371, provides a private cause of action for bad faith against an insurance company as follows:

> "In an action arising under an insurance policy, if the Court finds that an insurer has acted in bad faith toward the insured, the Court may take all of the following actions:
>
> (1)   Award interest on the amount of the claims when the basic claim was made by the insured in an amount equal to the prime rate of interest plus 3%;
>
> (2)   Award punitive damages against an insurer;
>
> (3)   Assess Court costs and attorney's fees against the insurer."

164.   United has engaged in a pattern of conduct against its insured, the Plaintiff in this case as set forth above.

165.   By virtue of its conduct, outlined at length above and incorporated herein by reference, United knew or should have known it lacked a reasonable basis to deny coverage of the health insurance claim made by Plaintiff for medically necessary treatments and prescriptions and recklessly disregarded its lack of

reasonable basis by a course of conduct that denied or delayed Plaintiff's entitlement to benefits.

166.   The action and conduct of United constitutes bad faith in violation of 42 Pa. C.S. § 8371.

167.   Pursuant to 42 Pa. C.S. § 8371, Plaintiff is entitled to the following damages as a result of United's bad faith conduct: Interest on the claims for the date the claims were made in an amount equal to the prime rate of interest plus 3%, costs and attorney's fees for this action, punitive damages, and such other compensatory and/or consequential damages allowed by law.

WHEREFORE, Plaintiff Christopher McNaughton demands judgement in his favor and against Defendants UnitedHealthcare Insurance Company and UnitedHealthcare, Inc. in an amount in excess of $75,000.00 plus attorney's fees, interest and costs and such other and further relief as the Court deems just and proper.

## COUNT THREE

Christopher McNaughton v. UnitedHealthcare Insurance Company and
UnitedHealthcare, Inc.

### Unfair Trade Practices and Consumer Protection Law

168.   Plaintiff incorporates by reference each paragraph of the above allegations as though set forth in full in this cause of action.

169.   For the reasons set forth above, United has committed unfair, deceptive practices prohibited by the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 et seq for which United is liable for treble damages, plus attorney's fees and costs incurred by Plaintiff.

170.   The deceptive and unfair practices committed by United heretofore described are defined as an unfair method of competition and/or unfair or deceptive act or practiced under 73 P.S. § 201 including:

a.   Causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services;

b.   Representing that goods or services have uses or benefits that they do not have;

c.   Advertising goods or services with intent not to sell them as advertised;

d.   Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made;

e.   Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

WHEREFORE, Plaintiff Christopher McNaughton demands judgement in his favor and against Defendants UnitedHealthcare Insurance Company and UnitedHealthcare, Inc. in an amount in excess of $75,000.00 plus attorney's fees, interest and costs, treble damages, and such other and further relief as the Court deems just and proper.

## COUNT FOUR

Christopher McNaughton v. UnitedHealthcare Insurance Company and United Healthcare, Inc.

Negligent Misrepresentation

171. Plaintiff incorporates by reference each paragraph of the above allegations as though set forth in full in this cause of action.

172. United owed Plaintiff a duty of care in taking reasonable steps to ensure the truth of their representations to consumers, including Plaintiff.

173. United operating through its agents, servants, workmen, and/or employees, authorized and acting within the scope of its employment, breached its duty of care in making the misrepresentation previously stated herein.

174. Plaintiff reasonably relied on such misrepresentations to his detriment.

175. As a direct and proximate result of the aforesaid conduct of United, Plaintiff has sustained damages as have been previously stated herein.

WHEREFORE, Plaintiff Christopher McNaughton demands judgement in his favor and against Defendants UnitedHealthcare Insurance Company and

UnitedHealthcare, Inc. in an amount in excess of $75,000.00 plus attorney's fees, interest and costs, injunctive relief and order requiring Defendants to pay for the medication and such other and further relief as the Court deems just and proper.

GESK MORITZ, LLC

Date:  November 30, 2022          By: *s/ Jonathan M. Gesk*
                                            Jonathan M. Gesk, Esquire
                                            PA ID 205678

                                            14 East Main Street
                                            Carnegie, PA 15106
                                            Phone:  (412) 429-9100
                                            Fax:  (412) 774-2110
                                            Email:  jgesk@gesklaw.com

                                            Counsel for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 30, 2022, I caused a true and correct copy of the foregoing Second Amended Complaint to be filed with the Court's ECF system, which constitutes service upon all counsel of record.


<u>*s/ Jonathan M. Gesk*</u>
Jonathan M. Gesk, Esquire